Ms. Callaway. May it please the Court. I'm Carolyn Callaway. I represent Laguna Construction Company. There are two issues in this case. The first is whether the Board actually had jurisdiction over the government's affirmative defense of fraud or whether it was a claim that needed to be submitted for a contracting officer's final decision. The government's affirmative defense has all the hallmarks of a claim. That is, it sought a reduction in the amount owed by the government to Laguna, which is definitely a request for a change in contract terms or a change in a monetary award, both of which require a final decision by the contracting officer. The standard under the regulation is that when you're proceeding under the definition of claim under the regulation. Yes. So the government is not seeking money damages, so we can put that aside. And I remember in the other two ways in which an assertion can be a claim is that the assertion require or involve, I'm not sure what the term is, either an interpretation of the contract or an adjustment of the contract. An interpretation of the contract or an adjustment of terms. The effect here, though, was that the government achieved a reduction in its commitment to pay the incurred cost under a cost-reimbursable contract of about $3 million. But if that's a government claim, then every affirmative defense could be a government claim in your view. No. I think it's easily distinguished from traditional affirmative defenses like waiver or accordance satisfaction. Why? Because if they went on that, they're still going to get the contract price reduced in some I think the way to look at it, though, is that if you could have achieved the same result by going to the board yourself, if you could have gone and made a claim to the board to reduce the amount of incurred cost by $3 million, then it becomes a claim. Or if you are asking for an adjustment in terms, like ignoring the disputes clause, the determination clause, that would be a claim, too. Well, their contention, and I'm confused about this, so I wonder if you can help clarify, and that is that the relation between your jurisdictional argument, the argument that the government can't go to the board because it didn't present what it's now arguing to the contracting officer, and what feels like a merits contention, which is that the incorporated FAR provision specifies the mandatory steps for the government to take to terminate and the mandatory remedies if there is a termination based on Laguna's fault, and they didn't comply with that FAR provision, and so they can't come in because it would be a violation of the provision they themselves put into the contract and say, you materially breached, so we don't have to perform including payment. And I just don't understand the relation between what seems a merits argument and your jurisdictional argument. There are two separate arguments, at least in my mind. In the first instance, should the board have even accepted this affirmative defense for a decision would be the jurisdictional argument. The second argument is assuming that they had jurisdiction and that Laguna breached, which we, of course, dispute. We do not believe that there was a breach here, or at least a material breach. Was it correct for the board then to reduce the amount payable under the contract for the incurred cost? The board assumed that the incurred cost claim was correct. That's kind of a fundamental proposition. Do you think that in government contracts, this doctrine of a prior material breach by one party can excuse a breach by a later party is viable? I don't believe so, because... I mean, it seems... I can understand why you'd argue about that, but how about we recognize that doctrine in the death case, in the Christopher Village case, and in other cases involving government contracts? Well, the Christopher Village case was not a procurement contract. It was not under the federal acquisition regulation. It wasn't a cost-reimbursable contract. It just really is not at all like this contract. So that's how you're answering the basic question I asked, which was, does this prior material breach doctrine, is it viable in government contracts cases at all? I mean, I understand that you want to make the distinction between FAR contracts and non-FAR government contracts. Maybe there is some difference, but do you accept that we have at least applied it in non-FAR government contract cases? Yes, on very different facts. I think the rule is... What would be the reason, because it's a common law doctrine, right? Yes. So what would be the reason for not applying it in a FAR contract as opposed to some other kind of government contract? Well, two reasons. First is that the FAR itself, the Federal Acquisition Regulation, provides a means of dealing with breaches and disputes, which is in the contract. This contract is not declared for it. Is there any indication that the FAR... in the CDA, that these common law defenses were abrogated? My understanding is that Federal government contracts are governed by Federal common law, unless it has been replaced by statute. Right, and we recognize in Christopher Village, at least, that one of those defenses can be the prior material breach. Right, and so I think the question then becomes, is that if there is a prior material breach, what is the remedy? And the... But the point of the doctrine is, if there's a prior material breach, it excuses a later breach by the other party. That's the common law defense. It excuses it, but there is a question of what happens then, and if the party who was the second breacher does not discontinue the contract, then they have waived their right to discontinue and can seek damages, but they can't actually, at that point, they can't just walk away. They can seek damages. They may be awarded damages, or they can terminate the contract. Neither of those happened here. I guess I was, although I was somewhat confused about the relation of several pieces here, I came down to thinking that your argument about the prior material breach law was essentially truthful. One, that the government didn't timely assert it, but instead, in fact, continued with the contract by accepting some of the goods and paying, and once you do that, you can't later say, okay, now it's all over. You can't terminate. And the second would be picking up on what's in comment A, the restatement provision on prior material breach, which says the parties can, of course, agree to a different procedure, and that your view is that a contract that incorporates the FAR provision is, in fact, a provision that displaces the background common law that says a prior material breach allows, in this case, would allow the non-breaching party simply to say, we walk away and we don't need to perform anything. Am I getting that? I think that is correct. And I don't remember the details, but would that be an explanation for distinguishing Christopher Village or any other cases where there's no FAR provision incorporated into the contract? I would certainly think so. The... Wouldn't the Christopher Village contract likely have included different procedures for resolving disputes as well? I don't... I haven't seen the Christopher Village contract, but my understanding is that... Well, it's one of the HUD housing contracts. I mean... Yes. They're extremely lengthy and have all kinds of provisions and unlikely provisions involving default and the like. Well, I know that there was a clause that said if they... If Christopher Village defaulted, then the government could foreclose. One thing that I can't quite figure out from the briefs and the record here is, what are these invoices for, and was the government continuing to accept payment for services that you were performing after it learned of the fraud, or was the fraud discovered after the contract was essentially done, and these invoices are essentially cleanup invoices to recover various other costs relating to already performed work? As far as I can tell, most of the invoices seem to bill for a tax. Yes. Yes. The fraud... The question of when was the fraud discovered would be 2008, early 2009 at the latest. Laguna was continuing to perform, continuing to submit invoices after that date. When you say you were continuing to perform, what do you mean you're continuing? They were building buildings in Iraq. And was there official acceptances of those buildings after? Yes. Where is that in any of that in the record? There's an admission. It's in the complaint in the announcer. The documents aren't actually in the record. Well, it's really hard to figure out what's going on when none of it's in the record and facts don't really tell us that. The government, I think, at least according to a note I have on page 53 of its briefs, says that Laguna's physical work was completed in 2010. Is that... That's probably correct. But if I can just explain what happened here. So they were billing during the period up through whatever it was in 2010 for actual work performed. At some time prior, I think it was 2006, the defense contract audit agency had raised a question about the Pueblo's Laguna tax and would not allow them to bill it. So finally, when that got resolved in 2011, they were able to bill for the tax and some fee that was remaining. So let me, I'm still a little fuzzy, but at the time you submitted these invoices that are issued here, when did that happen? Is that in 2011? These invoices were submitted in, I believe, August and September of 2011. So that was after the fraud was discovered. Yes, and so were quite a few of the ones submitted for the work in Iraq in 2009-2010. Those aren't the invoices we're talking about. No, they're not. We're talking about these invoices and whether they can assert defense as to these particular invoices. Well, they did come after. Now, there was... After what? I'm sorry. After the discovery of the fraud. Did the invoices were submitted or that the work upon which the invoice... was performed? The work on which... Because these are Pueblo Laguna tax invoices for the most part, they would have covered the entire period from 2005 to 2010, the work done in that period. They were just... Because the government had refused to pay them earlier, they had to be billed when the government finally said, yes, you can bill it. There was, however, one more invoice after these 14 invoices that was submitted and paid for $3.5 million. Can I ask, what would be the consequence if we were to agree with your jurisdictional argument that the government could not go to the board and make this affirmative defense without going to the contracting office? Contracting office. Okay. Then I think the board would take up our summary judgment motion, which was denied because of the affirmative defense, was not considered on the merits. Would the government... Would the contracting officer issue a fraud claim? No. So isn't the consequence of your argument that if you elect to go to the board and you think the board doesn't have jurisdiction over a fraud defense like this, then the government is precluded from inserting fraud in a contract. Oh, not at all. Well, the only way they could do it is if they filed their own claim in district court. Whereas if you would go into the court of federal claims, I think you'd agree there'd be no problem whatsoever with them asserting a fraud counterclaim here. The government has many, many tools to deal with fraud. The Anti-Kickback Act, which addresses this very issue of employees taking kickbacks with subcontractors, is the way that the government has to recover not only the amount of kickbacks... But that's the excuse on that. I mean, there's plenty of precedent the government cited that it doesn't have to only rely on anti-kickbacks. It can use kickbacks as a basis for an affirmative defense. Defensive defense of fraud, right? Well, they have here. I think that this is covered in my brief, but the Anti-Kickback Act tries to allocate the risk of the kickbacks between the two parties. They realize it's quite... I think the Anti-Kickback Act brings into this. They realize that they cannot prevent kickbacks because employees go off and do this without your knowledge, but they have provided a way to recover that through the Anti-Kickback Act or through the False Claims Act or whatever. But there's nothing in the Anti-Kickback Act that says it's the exclusive procedure for doing this. Indeed, the provision we're talking about says the contracting officer may. May offset. Right. It doesn't compel an offset. It seems to allow for other things, and in addition, there's nothing that would limit... that says this shall be the only procedure upon which, et cetera. No, and when it says it may offset, that becomes a claim by the government, which can be challenged by the contractor. It's not just an automatic, we take your money back. It's a claim. Right. But your argument here is that that's the exclusive procedure that they could have pursued. Under case law, they can also terminate the contract. There's no doubt about that. The government always has the option of terminating the contract. Well, if they didn't discover this, it didn't feel like they had sufficient basis for doing so until 2010, then that wouldn't get us anywhere, right? Because you said the relevant work that we're talking about for which these expenses were incurred occurred before 2010. The government had knowledge as early as 2008. Did they have to terminate the contract, or couldn't they just refuse to pay for the invoices? I don't see how they can... What's the difference there? Well, if they terminated the contract, even for default, Laguna would be entitled to its incurred costs, plus its reasonable portion of fee. Under the terms of the contract, the contract is not declared void, ab initio. But that term would still apply. Wait, so you think that if they terminated the contract, they'd still have to pay you all these costs? That's what the contract clause says. So in your view, there's just no way for them to use this doctrine of prior material breach to defend against these costs? I think that would be correct, yes. Because the government has... It doesn't matter whether they terminate it for default or not, in your view. It's just not a permissible doctrine. If the point is recovering the money, they had, if it was a prior material breach, they had the opportunity to terminate. They had the opportunity to seek damages. But you just said that if they terminated it, they still couldn't defend against those costs. The cost-reimbursable contracts are designed that way for a purpose. They're used when a job is high risk, you can't do... I don't want to pick up too much of your time, but if I get what you're saying, you're saying that even... And I know you probably dispute these facts, but even if invoices are affected by fraud, that the government cannot defend against failure to pay based upon this doctrine. That their only way to do it would be, perhaps, to file some kind of false claims act in district court or something else that I can't even think of, rather than just when you file, seeking these claims paid, defending against someone that failed. Is that right? Yes. Okay. Okay. Why don't we turn to the other side and then... May it please the court. Laguna breached the contract in two respects. First, to the extent that these cost-reimbursement vouchers were inflated by the kickbacks, the contractor materially breached the allowable cost and payment clause, which is at FAR 52.216-7. I thought that there was no finding that these vouchers were, in fact, inflated. The... That is a... These vouchers include various amounts. Some... They do include subcontractor costs. The board did not find it, in particular... That's correct. The board did not find that these 14... That can't be the breach. I agree. But the board did find a breach. The board found that there were cost-reimbursement vouchers that were submitted, that were paid, that were inflated by these kickbacks. And that was a breach of the allowable cost and payment clause. But aren't we talking here... Isn't the sum in dispute largely, almost entirely, based on amounts that weren't infected by the kickbacks? You don't really know. And the board didn't make any findings. They're mostly based on taxes, right? There's $24,000 of other costs. And what are the... Just that... What are the taxes for? They're like city taxes, right? I think it's called a Laguna Pueblo tax. Right. And what are those taxes assessed on? I don't know exactly the basis of it, but I assume it's the work performed under the contract. But they're taxes that are then paid to the Pueblo. Well, the board found specifically that the breach doesn't have to be these 14 vouchers. In fact, what's being alleged is that the breaches of the prior... Wait a minute, the 14 vouchers. What are you talking about? The 14 vouchers that were infected by the kickback scheme? No, no. This appeal is brought about 14 vouchers, which largely include the tax. There is numerous vouchers submitted to the government and paid by the government. And the finding is that those vouchers, at least some of those vouchers, are inflated by kickbacks and were paid by the government. So those are false vouchers. They were submitted in violation of the allowable cost and payment clause. And that is a material breach of the contract. And when you say the contract, you mean the umbrella contract, not the particular task orders? The overall. It's an indefinite quantity contract, the whole contract. Can I ask you this? Because it seems to me that this is more about the right remedial scheme than it is about whether there was a wrong. And I want to concentrate on the right remedial scheme. Let me ask you this first. If the government was required by the inclusion of 52.2496, the FAR provision, to follow the procedure to terminate the contract, and then Laguna could come in and there were provisions here for the parties to settle up in some way, do you agree with Ms. Callaway that you could not, in that process, under the FAR provision, assert certain kinds of fraud-related defenses to amounts that they're claiming that were infected by fraud? No, I don't agree with them. I think I have to explain, though. First of all, it really is based on the factual circumstances of this case. In this case, this is a different case. You have guilty pleas. So you have admissions of fraud during the performance of the contract. And you have a finding by the board that that conduct, that fraudulent conduct, the kickbacks, the inflated vouchers, that that conduct is imputed to the corporation. So this is not a case where the board itself would have to make a finding of fraud. It's not a case where the contracting officer would have to decide. I think I get all of that. Part of what was a little bit troubling, at least to me as I understood it, or misunderstood an answer that Ms. Callaway gave to a question that Judge Hughes asked, I took her position to be that if you follow the termination clause, these amounts have to be paid regardless of fraud. That's a fairly startling position. Right, I think that's a fair position, yes. But I think you disagree with that. Yes, we do. So fraudulently claimed amounts are not going to be paid under your view, even if you follow the FAR provision. That's correct. I'm sorry, so why doesn't the FAR provision inserted into the contract determine your remedies when you find a breach, namely termination for default? The FAR clause merely restates the anti-kickback act, the amendments in 1986. And it's exactly in the act that the contracting officer has this right of offset. So what the FAR clause is just to incorporate the anti-kickback act. I'm sorry, the FAR clause goes on at tremendous length, only one piece of which is the kickback stuff. Doesn't this, I guess let me just return to the comment A of the restatement provision that states the general principle of material breach by one party entitles absence, continued acceptance of performance and so on, the non-breach party to not perform anymore, including perhaps not to pay. Why doesn't the inclusion of the FAR clause displace that background common law right? It doesn't displace it because as explained by the second circuit in the general dynamics decision, when the 1986 amendments were made to the anti-kickback act, they were to increase the government's rights. They were not to cut back on the government's rights. And the FAR clause... I'm sorry, is this FAR clause limited to kickback? I thought it covers defaults, convenience, the whole panoply of grounds on which you can walk away from the contract. Okay, you're speaking now of the termination clause then? Yeah, I'm sorry. The termination clause applies when you're going to terminate work under the contract. Our argument with regard to the termination clause is first of all, the work was done. The work was done as of... There's certainly no evidence that there was any work going on after June of 2010. And I would cite for that the record at 596 and 1712. So the work is done. So this clause, the termination clause, is used when you want to terminate work under the contract. Termination here doesn't mean terminate the contract. No, terminate work. Now, here the work is done. But as I understand it, the argument that's being made is that they are entitled to all of their costs, all of their reimbursable costs under the contract. First of all, this clause, the termination clause... Let me make sure I understand this too, because I'm not a little fuzzy on all that. Or efficient. If you had terminated for default here, that termination for default wouldn't have precluded them from filing the same claim they are now pursuing for these reimbursable costs. It wouldn't be a defense to that. They have to find some other defense to that. I think that they would be filing a claim for their same cost under the termination clause. But our point is that the termination... I'm not trying to trick you here. I'm just trying to understand. Your view is that if the government had terminated this contract for default, it wouldn't have automatically canceled their right to seek the cost of these invoices and put forth the claim we're arguing about now. Correct. But we still have a defense. Because under the clause, you only are entitled to reimbursable costs. And the termination clause doesn't define reimbursable costs. Then you have to go and look at your allowable cost and payment clause. And your view is that once we're looking at reimbursable costs, and they seek them, don't get them paid, and go to the board, that this common law defense of a prior material breach is available. Yes. Yes. And that would have been true even if it wasn't a fraud breach. If it was some other prior material breach, you could assert that defense. Yes. But in this case, what we're concerned with is a fraud breach, a breach which is material because it involves the kickbacks, the conscious wrongdoing on the part of the corporate officials. And what's your best case? Because I do find this really kind of puzzling. This seems, particularly when it's alluding to the breach of the duty of good faith and fair dealing, which it seems odd for me that the government would rely on since it usually tries to limit that doctrine. But what's your best case for the notion that this common law defense is still viable after the enactment of the CDA and these FAR clauses? There is a Brown construction case that's cited by both parties  that found a breach of the duty of good faith and fair dealing. And in those circumstances, the court refused to enforce the contract. Also, we have cited the Joseph Morton case, which is a CDA case, a FAR contract in which there was a prior material breach involving one change order. And because of that breach involving one change order, there couldn't be any recovery. And we also think that the Christopher Village case is, from our point of view, the best case, because that case involved kickbacks. It involved false statements. It involved payment. It involved... Sure. I mean, it seems like Christopher Village is the obvious case. But the problem there, of course, is that it's not a CDA contract, right? Yes, it's not a CDA contract. But I also pointed to the Joseph Morton case and the Brown construction case. And then also here, there's two breaches that were found. There's a breach of the allowable cost and payment clause because the vouchers were false vouchers and they were paid by the government. And then second... I'm not familiar with the Jets case. You've cited it in your brief. It's an older case, but it's from the AFPCA. I just couldn't tell from reading it whether that was a CDA contract or not. Which case are we talking about now? JETS. I believe the Jets case is a CDA contract case. So here, the breach was clearly a material breach because as I said, it involved... There were kickbacks. There were false vouchers being submitted, false vouchers being paid by the government. And it's the type of conduct, conscious wrongdoing on the part of the contractor that would justify the government not paying the remaining vouchers. The contractor has raised the defense of waiver. What we've pointed out is that this is a defense based on... It's a question of fact as well as a question of law in that that defense of waiver was not made before the board. Before the board, what was argued was that the rights and remedies were only those provided in the contract that you could only terminate for default and then you had to pay all of the costs. They didn't make the argument that there was a waiver. But what we've also pointed out here is that all of the work was done before there was a determination of kickbacks. And under the Martin Simpson case, if there isn't a guilty plea, the contracting officer doesn't have any authority to take any action. So prior to the guilty plea, if the contracting officer wouldn't have had any authority to... The contracting officer can't make his or her own determination that fraud has occurred and reject a claim. That's correct. And we also cited the Turner case, which is interesting. It's a board case in which a contracting officer tried to find kickbacks, but there were no guilty pleas. So until the government learns of a fraud, there's no basis... Not even fraud. Until there's a factual finding by some court or body of competent jurisdiction, the contracting officer can't reject any claims, terminate the fault, or do anything like that based on fraud. That's correct. And we've cited for that... How far does that go? Your defense here was near breach of a duty of good faith and fair dealing. Can the contracting officer conclude that that is a ground  It would depend upon the circumstances of the case. Well, I'm trying to understand what the scope of this principle is. The contracting officer cannot utter the word fraud, find facts that if found would amount to fraud. You did not make an actual fraud defense here, right? You made a defense, prior material breach of a good faith, fair dealing implied term of contract. Right. And the contracting officer really could not have said in 2005, six, seven, eight, nine, during all the years when there was lots of auditing investigation of and billing, couldn't have said, we don't trust you anymore. Terminate for default. He can't terminate for fraud. Absolutely. I didn't say anything. I didn't use the word fraud. Where did this principle come from? The contract? It comes from the CDA, that the contracting officer doesn't have the authority to make a finding of fraud. But you don't need to find fraud in order to find breach of a duty of good faith and fair dealing by the submission of these various invoices that were for more than a proper amount, do you? Or is it a substantive inquiry that he just had to ignore all of this until somebody other than the contracting officer adjudicated it? Typically, if it's just simply an erroneous invoice, that's a mistake. That's a different type of case. But if the assertion is that it's a false, intentionally false invoice, and because you have submitted an intentionally false invoice, conscious wrongdoing on your part, the contracting officer cannot make that decision under the contracts dispute. So on a going forward basis, the government is going to live with the proposition that with all five years worth of stinky but not yet adjudicated, fraudulent conduct, the government contracting officer may not terminate the thing for default. That's correct. Under this court's decision in Martin Simcoe, that's excluded from the contracting officer's authority. And we also cited the Turner case, which is another example of the application of that same principle. So until you have a guilty plea or a judicial determination of fraud, then you can't have a contracting officer making any decisions based on it. It's not for his decision. This is something that's within the authority of the Department of Justice and other agencies. It's not within the authority of the contracting officer. Including the necessary determination for untrustworthiness. If the untrustworthiness means fraud, then yes, it's excluded. Now, if you're going to terminate a contractor because they are continually sloppy, they keep making mistakes, I think that's a different case. Just a couple of things I'd like to address. The contracting officer can terminate for convenience at any time. There's no significant difference between a termination for convenience and a termination for default in a cost-reimbursable contract. As early as 2005, the defense contract audited... But if the contracting officer terminated for convenience, you'd be entitled to all of your costs, right? Also under default. Right. Unless the government is right that in the H-1 process of determining what's reimbursable, they get to argue about whether there was fraud. Of course. No, they don't get to argue about whether there was fraud. They get to argue about whether there was overpayment or whether the costs were unreasonable and the DCAA and the Forms 1 have raised issues about cost reasonableness. That's what our claim is about. I think your bottom line view is that no matter what kind of fraud occurred in this contract, because it didn't relate to these invoices and because... Well, essentially, because it didn't relate to these invoices, the government can't use it as a defense. And you're entitled to your allowable costs. That the fraud in the other parts of the contract, assuming those are related, is not a defense at all, ever. The board has jurisdiction over the contract costs, determining what the reasonable costs are, whether a default termination was correct, interpretation of contract terms. They don't have the jurisdiction. They don't have the power to impose a penalty of taking back... And I'm not just talking about the board and its jurisdiction, because it seems to me that the theory you're making goes far beyond just what the board could do. It can also go to what the court of federal claims could do as well. Absent a claim under the False Claims Act or a special plea in fraud, your view is that this fire, material, and breach doctrine can never be used on a fraud basis to defend against a claim for otherwise allowable costs. I may not understand this, but my understanding of the prior material breach doctrine is the first party commits a material breach, even if the second party, when they breach, didn't know about it, they're excused. But excused doesn't mean that you get to walk away. You can terminate. You can seek damages. Or you can refuse to pay contractor claims. That's what happened in Christian Village, right? Under a very different type of contract, yes. But the government here is not without remedy. As early as 2005 or 2006, they could have just simply terminated the contract for convenience. When they heard about these issues in 2008, they could have terminated for convenience and probably for fraud because at that point, they could have examined invoices and said, yes, these appear to be overpriced. We have evidence. But haven't you said, even if they do those terminations, you're still entitled to the cost here. So they are, under your theory of the case, without remedy to oppose these invoices and costs out here. The remedy under the contract is the 52249-6, which says that if you performed work, you get paid. So no matter how much fraud goes on in the contract, as long as the government can't connect it up to the cost side, they have to pay you. Unless the contract was void ab initio. For example, what for a conflict of interest or, well, even there, if work has been performed and accepted, the government would still be liable for payment, even if the contract was void and rescinded. OK, we have your argument. Thank you. Thank you. The next case for argument is 15-1453, Henry D. Stefan. OK. Mr. Paul, whenever you're ready. Good morning, Your Honor. As you may please the court. Under the law, the printed matter doctrine applies to novel arrangements of printed lines or characters useful and intelligible only to the human mind. Our claimed web assets do not meet that definition. In King Pharmaceuticals, this court expanded that definition. Can I ask, let me just say how I'm thinking about it and then you can tell me. It seems to me you're biting off way more than you need to bite off here. OK. Why isn't a simple proposition on which reversal of the board on printed matter would be required is that the printed matter exception requires a necessary but not sufficient condition that the element at issue claim the particular expressive content of some expression. This doesn't. And in particular, the origin of an expression is not the expressive content. It doesn't matter whether the reader is a computer or a human being. Origins of the expression are not part of the communicative content. And as far as I can tell, the printed matter doctrine has never been applied except when what is being claimed is the particular communicative content. If it is, then there are some exceptions and there can be a relation, a functional relation. But this isn't that. I think I'm having trouble understanding your distinction. Your patent doesn't claim any particular printed matter. No. I think that's the question. But when it doesn't claim particular printed matter but refers to the origins of different types of printed matter, that's not printed matter itself. I agree. And I agree that in the very first part of our appeal brief, we stated that printed matter doctrine applies to printed lines of character that's useful and intelligible only to the human mind. Claimed assets do not. And therefore, that's enough. That seems to me a broader proposition than the proposition you need because that proposition would exclude content readable by a computer. Well, that's a more difficult proposition to sustain than the narrower proposition that an element that does not claim the content of a communication is not an element to be ignored under the printed matter doctrine. Regardless of who the receiver of the content is, it just doesn't apply to that. I believe certain content can be given patent away. I mean, for example, if the content of a data structure is the amount of users using a particular server and you're doing load balancing, so you have one server is load balancing 10 other servers because you have 10 or 100,000 users using it and you have to balance them out there, that's informational content. And I believe that if claimed as a data structure, that informational content is the number of users attempting to access this server. Well, yeah, that should be given patent away. Again, I'm just... Your point is kind of throwing me for a loop because it's not part of the case. Why are you pushing back? Oh, no, no, I'm not pushing. I'm just trying to understand. Well, you're trying... I mean, at least in your brief, you're trying to argue for the big, broad rule that the printed matter doctrine can't apply to computers. And what I'm telling you is we're not going to buy that argument because you have a much simpler and more narrow argument that you should win on. Yeah, well, and I believe that the printed matter can apply to computers if it's directed to the underlying content. And that's what was said by this court in Lowry, in which they stated these claims are not directed to the underlying content. And for example, just to give a way of example, a audio file is a data structure. It explains to the computer, this is what it is, this is how it should be operated on. Whereas if the data structure is, if it's the audio file is the Star-Spangled Banner, the Star-Spangled Banner part of it is the underlying content. And that shouldn't be given in patentable ways. And so, but we're not making that, I mean, our claims aren't directed to that underlying content. Can I? Sure. Just moving on ahead, which is if indeed on some of the contents here with the result and the reversal of the board here, what is your view as to how we proceed? This case has been going on for over 10 years, but was the reversal on the printed matter doctrine question result in, in your view, result in a rename so that the board could revisit this question? The board could revisit it and the board, yes, of course, the board could revisit the issue depending upon what this court states. And if the board does reverse and does send it back to the examiner, the examiner is not prevented from reopening prosecution. MPP 1214.04 specifically permits the examiner where there are situations where there probably aren't that indicate unpatentability of the subject matter, they can request to reopen prosecution. So, yeah, we do get a reversal here. There's no guarantee that we're going to get a patent. So you think that even if we reversed on claim 24, we should go on to review the claim construction? That's not necessary. Not necessary. If, if, if you, if, I mean, it's necessary, if the, okay. I'm going to agree that it's not necessary. We have a certain amount of discretion about whether it would be prudential to decide an issue that might well come up on remand. Would it be a good idea for us to address that? I believe the brief stands for itself, but if you have any questions, I would be more than happy to answer them. I mean, did you, your argument, at least as I understand it, rests pretty heavily and maybe this is perfectly sufficient, I guess, on a combination of two things. One, that a search request, at least implicitly, entails identification of a criterion for the recipient of the request to use to compile the list. Yes. That's not the same as  And second, that a number of picking things on a list of descriptions in the specification are fully accounted for by the specifications acknowledgement, but sometimes searches don't need to be performed and those would be examples where searches are not being performed. The example in the specification that talks about where searches are not performed, they're actually in re-reading it and I made this point in the recovery, is there actually, there isn't a criterion involved. The criteria is, you know, this is a sound file or I'm having, there is, even where there's quote unquote no search being involved, there is still a criteria and so that language, again, written some 14, 15 years ago, isn't exactly accurate in determining what the search, you know, a search still requires a criteria. I mean, that's been one. Is there another question? I'm here from the government. May I please the court? We fully acknowledge that this claim does not entail printed words on a piece of paper. It's not traditional printed matter as that term has been used in prior court decisions. I still think that the underlying policy of the printed matter doctrine applies in this case in that as this court explained in King Pharmaceuticals, we want to prevent the indefinite patenting of claims just by adding a novel but unfunctional addition to the claims. And here, clearly, I think it's pretty undisputed that the origins of the web assets provide no function to the rest of the method. Can I just ask you, I mean, there are two things on which you say repeatedly in your brief that I guess I didn't really track. One is the heading, the origins of the web assets are non-functional descriptive material. That sounds like nonsense to me. I mean, the origins are not descriptive material at all. Non-functional or otherwise. It's just not a description. They're described, I mean, in the claim. Like the provenance of a line is not descriptive. It is where it came from. Yeah, but that's something that's describing it. That's a property that's telling you something. I think that the origin is not put into the material that is claimed. If the material said, I come from the user, as opposed to I come from third party, then the origin would be part of the descriptive content. Well, I think that's the point. The origin has no use here. There's no application. All right, so one point is it seems to me the origin just isn't descriptive material at all. The second thing that you said, say, a number of times is the method step, it doesn't change the, the origins don't change the method at all. Again, I don't understand how that can be. One method involves selecting things from A or B. Another method involves selecting things from A. How are those things not different? Well, I think the point is that the rest of the, it doesn't matter where you pick your web asset from, the method. It matters under the claims. Why doesn't it matter? If, say, I'm obviously not a web designer or anything like that, but 10 or 15 years ago, say these basic web design packages came out and it limited you to only the materials provided with the web design software, and you couldn't go outside that. You couldn't put in your own pictures, your own, you know, videos or anything like that. You were limited to the software package. And this company comes along and says, we found a new method that doesn't confine you to just the materials here. You can also go and use your personal resources. Why isn't that a functional difference? Well, if that was the case, that really, you know, choosing from that, in the prior art, you could only choose from A, and then your claim, now you say you can choose from A or B. And, you know, that's a leap from the prior art that has some function. I agree that that may be a case where that limitation would be given weight. But, you know, the... But do you think that's the limitation we're talking about? That you found irrelevant. It may be that you should have found it obvious. Well, I think, I mean... But to disregard it on a printed matter doctrine when it's not printed matter at all is problematic. I think the issue that the board came across here was that the claim sets up to have, you know, this distinction between where you get your web asset from, but then in the rest of the claim, it makes no use of that. So, for example, in the... But that's for the... I mean, lots of claim elements don't use other elements of the claim. And the fact is, you say the origin of the selected web asset does not in any way change, alter, or affect the method. I just want to... Well, I agree that... You can't get how that could be true when the claim says select from A or B. I agree that there's... It does affect it. I agree there's a difference between selecting from a third-party web asset versus selecting from a user-submitted web asset. That's different. I agree. So if that's... I mean, if you think that's a different method, then... Well, you just said you think that's a different method, too, right? Well, I mean, the point is that the rest of the method steps will perform exactly the same, no matter where you get your web asset from. It doesn't matter if you get your web asset from a third party, from yourself, from the internet. The origin of it has no bearing on how the method is performed. Except that for certain parts of the steps, using different origins, you go to a different place. I mean, the fact that everything else in the program works the same way doesn't mean that this particular method step has no function. I mean, if nobody had ever thought of it before, the fact that the only difference between this and the prior art is that you can go outside of what was provided and use your own resources. The fact that everything else is the same doesn't mean it's not a patentable step, does it? What they were getting at in the specification here, and if you read the specification, they have a system set up so that when a third party web asset author, when you select their web asset, it's supposed to provide payment to them. So if you create these images or these files or whatever, you put it in the database, then if someone selects your image or your music file, you get some credits and some money. It's in this application? Yeah. It's in this application. So I agree. There is some... I mean, the distinction between the two didn't come randomly. I mean, I think that's the basis. But I think this distinction isn't the point of the invention. There's no discussion that it's necessarily a patentable step or anything like that. But that doesn't make it printed matter. It just makes it obvious. Yeah, I think that's the thing. I would think if this case came back, there would be an easy obviousness rejection or even an anticipation rejection by saying that it was within the knowledge and the art that you could choose from different places. I mean, was there evidence of that? This is, this dates to what, to 1995? Is that right? That's a long time. Yeah. What we all have in our heads right now is not what we had in our heads in 1995. The problem is that we don't... We don't have any evidence on that because this printed matter rejection first arose at the board. So at the board level. So we don't have... The examiner incorrectly thought that this reference met the claim limitation even given we told the words. So that's why the board reversed that rejection and then put in a rejection themselves. So if it came back, I think that, you know, we could open up, reopen prosecution as Colin said, and examine whether this claim is anticipated or obvious, giving weight to all the claim limitations. Can I ask you about the search request issues? I guess I was struck almost at the threshold with the following problem, I guess, with the board's claim construction. A definition is supposed to take a form such that you can replace the thing being defined with the definition, plop it in and it makes grammatical sense. That seems to me not to have gone on here. A search request is something that is being, under the claim, received. It is not the act of doing something. It is an information packet to be acted on by the receiver of that information packet. That's not a selective retrieving of data. And while that may seem like a small matter, it seems to me to get at the problem with the board's claim construction, which is that this information packet is supposed to tell the receiver of that packet, go and find something. That seems to me to entail a criterion, one or more criteria, for how the receiver of this information packet is supposed to go and find something. And that's what it seems to me the board eliminated with its claim construction. I think that the board was just looking at the broad use of the term search request and the specification and giving the term its broadness, reasonable construction, because as we talked about in the brief and as we talked about with the Pellant, there are examples in the specification where you're just choosing from a list. All of those examples, I don't want to be contentious about the question, but is it true or not true that all of those examples can be understood as coming under that portion of the specification language that says sometimes you don't need to have a search, like when you just say, oh, I already see the list of choices. I want that one and that one. That's not a search. I don't believe so, because I think if what we cited in our brief in the specification, the example in the specification where this comes up is choosing a color. So they just provide you a list from what's called the color palette and you just choose one color. And that is specifically referred to as a search request in the specification. If you look, so in our brief, it's on pages 25 and 26, and then in the appendix, it's A668 line 26 to A669 line 6. So it says, 668? Yes. So the information that is obtained is responsive to the search request entered at step 1604. That is the information concerns color elements. 669, at the top of 669, got it? Yes. So it says the search request was made via color palette 640. So the color palette is just the example where you can just, you don't enter anything in, you don't enter a keyword search, you just select a color you want. And that's specifically referred to as a search request. So I think that the board was just going on the breadth of the specification, which gives an example of a search request where you're not entering a keyword. You're not performing the traditional kind of Google searches as you think of it. I would hope that this court wouldn't look so narrowly at the Printer Matter Doctrine and see that this case, while not traditionally fitting to Printer Matter, really the same underlying policy applies that... Can I just make my understanding? Sure. Printed Matter Doctrine is not actually statutory. So you're making an argument that a doctrine that is not statutory, that has been said over many decades to be one without a very decent statutory foundation should be broadened according to some broad policy one can find in this non-statutory doctrine. I don't think we're necessarily broadening it beyond what is said in the King Pharmaceuticals case. That was actually a claim element that says communicate the following information to somebody. Correct. But I don't think it was the fact that it was communicating information that rendered... Is there any Printed Matter case that doesn't, at a minimum, just a necessary condition, at a minimum, require and involve a Printed Matter case in which the doctrine was applied to support disregarding a claimed element that didn't involve an element that claimed the content of an expression? I'm not aware of one. Yeah, I'm not either. But this is... I mean, it's still providing... The origin is still providing you some information. It's providing information to the user and not... You know, I just think that we'd be allowing the indefinite claiming of something that has no function here. That's merely descriptive. If you say it's indefinite, why don't you reject it? No, not indefinite in the patent indefinite sense. The sense that you can just keep adding these kind of trivial limitations that don't distinguish them over prior art, so therefore they're obvious. Well, I mean, you're really asking us to let you be lazy. I don't mean to be mean about it, but this is the third Printed Matter case I've seen from you all, and I've only been here two years, and they've all involved instances like this. So you're just trying to fix a sloppy examiner's rejection. I think that in this case, an obviousness rejection can clearly be made, but I think that there could be a case where you add a limitation that's not functionally related to the method, and it wouldn't be obvious, because if you're picking something, if you're adding something that has no functional relation to the method, you can understand that it may not be so obvious. So I think sure, obviousness could be substituted here, but it may not be the case. OK, thank you. Thank you. Let me just address a few of the points made. The invention actually goes, claims part, to 2000, June 2000, not 1995, but still 15 years ago. Opposing Consul talks about the origins of the web assets, those that we talked about, but mentioned in the reply brief. When we specifically asked the board, what do you believe to be the print of matter? They did not state the origins of the web assets was the print of matter. And so had the board done that, we would have changed our appeal brief accordingly to address that particular point. Now, to go to your point, to choose about being a web designer, I'm no web designer, but where you get the web assets, in this case, where if it's provided to the user, the functionality would have to be, those web assets would have to be stored locally in the computer, either in memory or in a hard drive or in a diskette. And the user interface would have to access those web assets in a different manner, in a functionally different manner than it would be able to access the web assets that were associated in the database that's in the website design server. And so there is a functional difference associated with those limitations. And you could argue about that if there were an obviousness rejection about whether it is. Absolutely. What I always say about obviousness rejections is until I see the prior art and until I understand what was art at the time of the attention, it's tough for me to decide whether something's obvious or not. And based upon the prior art that they provided and the 102 rejection in which these claims are rejected, there is no obvious rejection currently before us. Not to say they can't do it later, but certainly not before us. Can I ask you a very specific question about the search requests? Yes. Page 669 of the appendix. So this is page 669, page 39 of your application. And up at the top, it speaks of, I guess Mr. Foreman indicated, the line about information obtained of various places concerning sound elements if the search request was made via sound menu 540 and concerns color elements if the search request was made via color palette 640. Does not that language use the phrase search requests to a simple pick from a menu that you are looking at? A menu that has already had a criteria applied to it, which is a color palette. So you've had, it's a search request in the context of either color palette, sound palette, or what have you. It's not a search request that you have, let's say, an entire list of objects that haven't already been, and a criteria has already been applied to it. Again, it's a color palette. You have a criteria already applied to it. And so, and again, that still falls within our definition of search request. That has to involve a criteria. If there are no other questions, thank you.